**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MANOKIA MUSONGE,**<br><br>　　　　　**Plaintiff,**<br><br>**v.**<br><br>**T.D. JAKES FOUNDATION,**<br><br>　　　　　**Defendant.** | **CIVIL ACTION NO.** _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

Plaintiff Manokia Musonge, by and through her attorneys, Bell & Bell, LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1. This is an action for an award of damages, punitive damages, attorneys' fees and other relief on behalf of Manokia Musonge, a former employee of T.D. Jakes Foundation (the "Foundation", "Defendant", or "TD"). Ms. Musonge was wrongfully terminated in retaliation for refusing to engage in and reporting unethical and illegal activity regarding fraudulent financial practices of the Foundation. Mr. Musonge has also been harmed by the Foundation's breach of implied contract and false promises and misrepresentations with respect to the terms and conditions of her employment, which induced Ms. Musonge to accept employment with TD, and upon which she reasonably relied.

2. This action is filed pursuant to the common law of the Commonwealth of Pennsylvania.

## JURISDICTIONAL STATEMENT

3. This Court has diversity jurisdiction over this matter pursuant to 28 USC. § 1332.

4.      The amount in controversy in this matter exceeds the jurisdictional minimum of $150,000 exclusive of interest and costs.

5.      The Parties hereto are citizens and/or residents of different states.

6.      Plaintiff Manokia Musonge is a citizen and resident of the Commonwealth of Pennsylvania.

7.      Defendant T.D. Jakes Foundation is a Texas 501(c)(3) non-profit, with its headquarters and principal place of business in Dallas, Texas.

8.      All conditions precedent to the institution of this suit, if any, have been fulfilled.

## VENUE

9.      This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 USC. § 1391(b).

10.      This action properly lies in the Eastern District of Pennsylvania because the claims and significant activities associated with the claims arose in this judicial district, and Plaintiff was employed by Defendant in this judicial district.

11.      This cause of action arose out of transactions or occurrences that took place in whole or in part in Montgomery County, Pennsylvania.

12.      The Foundation regularly conducts business within Montgomery County.

13.      Most, if not all, of the acts referred to in this Complaint occurred in Montgomery County, Pennsylvania.

## PARTIES

14.      Plaintiff Manokia Musonge is an adult female individual who is a citizen and resident of Cheltenham, Pennsylvania and the United States of America.

15.     T.D. Jakes Foundation is a Texas non-profit corporation with a corporate headquarters and principal place of business located at 5500 Preston Road, Suite 250, Dallas, Texas 75205.

16.     At all relevant times, employees of TD were acting as agents and servants for TD.

17.     At all relevant times, employees of TD were acting within the scope of their authority and in the course of employment under the direct control of TD.

18.     At all times material hereto, TD acted by and through its authorized agents, servants, workmen, and/or employees who were acting within the course and scope of their employment with TD and acting in furtherance of TD's business.

19.     This Honorable Court has jurisdiction over Defendant.

### **FACTS**

20.     T.D. Jakes Foundation is a 501(c)(3) nonprofit that accepts donations to maintain initiatives, provide grants to organizations, and partner with other nonprofits and corporations to advance its programming.

21.     Among other sources of funding, in or about April 2025, the Foundation received funding from Wells Fargo to provide grants to organizations across the United States.

22.     Manokia Musonge began her employment with the Foundation on September 3, 2024, as Chief Marketing and Administrative Officer (CMAO), after being recruited by Kelley Cornish, T.D. Jakes Foundation Chief Executive Officer, for the role.

23.     At the time, Ms. Musonge had recently been promoted to a leadership position with Wells Fargo, and she resigned from that position in order to accept the CMAO role with T.D. Jakes Foundation.

24.     The Foundation's operations are located in Dallas, Texas, but Ms. Musonge worked remotely from her home in Cheltenham, Pennsylvania.

25.     Based upon commitments from Ms. Cornish of opportunities for career growth and stability, Ms. Musonge planned to relocate herself and her family to Texas.

26.     During the first months of Ms. Musonge's employment, Ms. Cornish expressed great satisfaction with Ms. Musonge's work and praised her accomplishments.

27.     Ms. Cornish's relationship with Ms. Musonge changed substantially in December 2024 after Ms. Musonge raised concerns regarding Ms. Cornish's misuse of the Foundation's resources for personal purposes, including her systemic diversion of Foundation staff and resources to support Ms. Cornish's personal endeavors.

28.     Specifically, Ms. Musonge learned, after she was hired, that Ms. Cornish was using Foundation resources to produce her own personal podcast and website, including the use of substantial employee time to support these endeavors during work hours, which was compromising these employees' ability to complete Foundation work.

29.     Multiple direct reports expressed confusion about priorities given Ms. Cornish's directives and how they fit in with their scope of work and the Foundation's stated goals.

30.     Ms. Cornish was also requesting that individuals who had benefitted from donations from the Foundation (and therefore felt obligated to participate) appear on her podcast to promote her personal brand and messaging, without any mention of or benefit to the Foundation.

31.     Ms. Cornish's response was to dismiss Ms. Musonge with a vague assertion that she would "get her own person."

32.     Following this conversation, Ms. Cornish's demeanor and communications with Ms. Musonge shifted significantly, and Ms. Cornish regularly expressed frustration toward Ms. Musonge.

33.     Subsequently, Ms. Musonge discussed concerns about Ms. Cornish with Chief

4

Financial Officer Brent Wilson, including concerns about how Ms. Cornish's use of Foundation finances and staff time to advance her own interests conflicted with Wells Fargo funding restrictions, as the purpose of the funding from Wells Fargo was to fund the Foundation to provide grants to organizations focused on empowering communities.

34.     Mr. Wilson stated that the Foundation needed to be careful about fund allocation, that he believed that Ms. Cornish's conduct constituted an "abuse of power," and indicated that he would speak with Ms. Cornish about it.

35.     However, Mr. Wilson later told Ms. Musonge that when he approached Ms. Cornish she was very defensive and claimed that her activities were not costing the Foundation any money.

36.     After Mr. Wilson raised the issue with Ms. Cornish, Ms. Cornish agreed to "mention the Foundation" in her podcast as a compromise.

37.     Ms. Cornish's retaliation against Ms. Musonge continued in early 2025, when Ms. Musonge's position was retitled to "Chief Administrative Officer" (CAO), effectively a demotion, and a Vice President of Marketing was hired and onboarded.

38.     In addition, during this period, eighteen of Ms. Musonge's direct reports were removed.

39.     Further, despite Ms. Musonge opposing Ms. Cornish's unethical use of Foundation funds and resources, Ms. Cornish continued to direct Ms. Musonge to help her with her personal endeavors.

40.     For example, in or about April 2025, Ms. Cornish asked Ms. Musonge to complete her executive education homework assignments, which Ms. Musonge felt obligated to do to avoid further retaliation.

41.     This was completely outside the scope of Ms. Musonge's job duties and used Foundation-paid time for Ms. Cornish's personal academic benefit.

42.     Ms. Cornish's reaction to Ms. Musonge was consistent with the negative way that Ms. Cornish reacted when other employees questioned her or raised issues of inappropriate activity.

43.     Ms. Cornish would appear visibly annoyed and openly discuss taking action against such employees.

44.     For example, when Anna Ponder, Chief Impact & Philanthropy Officer, challenged Ms. Cornish, Ms. Cornish told her that she "sucked the air out of the room," and told Ms. Musonge that she "knew" she had to "let her go."

45.     Similarly, Ms. Cornish targeted other employees, including Tiffani Martin (a visually impaired employee), for discipline or elimination when they challenged Ms. Cornish.

46.     In the case of Ms. Martin, after Ms. Cornish moved to eliminate Ms. Martin's role on the stated ground that there was "no work," Ms. Musonge recommended redeployment to make use of Ms. Martin's skills. However, Ms. Cornish declined, and the elimination proceeded.

47.     Despite the retaliation Ms. Musonge faced, she continued to be an exemplary and high- performing employee.

48.     Indeed, Ms. Musonge was repeatedly recognized for her diligent work, as well as her innovative and creative ideas.

49.     Despite the well-deserved positive feedback she received regarding her work, following Ms. Musonge's reports of unethical and illegal activity and raising governance concerns, Ms. Cornish continued to criticize and demean Ms. Musonge.

50.     For example, Ms. Musonge was told that she was "too sensitive" and that as a result

6

she would "never make CEO."

51.    The hostile work environment and retaliation came to a head on or about August 14, 2025, when Ms. Musonge received a phone call and was notified that she was being terminated, effective August 15, 2025.

52.    Ms. Musonge was given two reasons for her termination: that Ms. Cornish was not satisfied with Ms. Musonge's performance and that the CAO position was being eliminated.

53.    These reasons are mere pretext for retaliation for Ms. Musonge refusing to participate in and reporting illegal and unethical activity.

54.    Ms. Musonge's termination letter only cited the elimination of the CAO position as the reason for her termination, and Ms. Musonge did not undergo any formal performance reviews during her tenure at the Foundation.

55.    As described herein, however, Ms. Musonge was consistently praised for her performance, including as recently as August 2025.

56.    Notably, the Foundation continues to pursue Ms. Musonge's marketing proposals, including her proposal relating to a social media campaign on Fridays, titled the "Power of Five."

57.    Following notification of her termination, Ms. Musonge requested that the Foundation clarify the reason for her termination and provide information and documentation relating to the decision to eliminate the CAO position.

58.    Despite her request, she has yet to receive anything in response.

59.    The Foundation has furthermore falsely characterized Ms. Musonge's response to the termination.

60.    The Foundation alleged that it provided an alternative option for her termination by framing it as a sabbatical.

61.    Ms. Musonge correctly raised that this was untrue, as she was not going on sabbatical but rather was being terminated.

62.    The Foundation then claimed that Ms. Musonge rejected this option, which is incorrect – Ms. Musonge merely noted that this narrative was inaccurate.

63.    Ms. Cornish has also exacerbated this situation by her conduct shortly following Ms. Musonge's termination, as she posted the following message on Facebook: "Hire people who say, what if we tried this, not what if it fails."

64.    Based on the foregoing, Ms. Musonge maintains that she was wrongfully terminated in retaliation for refusing to engage in and reporting unethical and unlawful acts of the Foundation, including concerns relating to donor compliance, in violation of state and federal law.

65.    These wrongful acts of the Foundation resulted in extreme embarrassment, humiliation, and harm to Ms. Musonge's professional reputation and career.

66.    Ms. Musonge has suffered significant financial losses, including lost wages, as a direct and proximate result of the actions and inactions of the Defendant.

67.    As a result of the Defendant's conduct described herein, Ms. Musonge has incurred a significant obligation for attorneys' fees and costs of bringing this action.

68.    As a result of Defendant's conduct described herein, Ms. Musonge has suffered and continues to suffer significant emotional distress.

69.    Defendant and its agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Ms. Musonge to suffer emotional distress.

70.    Defendant's actions were intentional and willful and warrant the imposition of punitive damages.

## COUNT I
### Wrongful Termination

71.     Plaintiff Manokia Musonge repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

72.     Ms. Musonge opposed and refused to participate in unethical, illegal and/or unsafe activity engaged by Defendant, as alleged herein.

73.     The activities Ms. Musonge observed and refused to engage in constituted breach of fiduciary duty, corporate waste, misuse of corporate and/or government funds, inappropriate and harassing behavior, violations of corporate governance, and violations of, among other laws, Title 18 § 4107 (deceptive or fraudulent business practices).

74.     Defendant terminated Ms. Musonge in retaliation for her opposition to and refusal to engage in unethical, fraudulent and/or illegal activity in violation of Pennsylvania public policy.

75.     The above-described conduct of Defendant, in terminating Ms. Musonge, represents wrongful termination pursuant to the common law of the Commonwealth of Pennsylvania.

76.     As the direct and proximate result of Defendant's wrongful termination of Ms. Musonge, Plaintiff has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, damage to her professional reputation and career, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

## COUNT II
### Promissory Estoppel

77.     Plaintiff Manokia Musonge repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

9

78.     Prior to accepting employment with the Foundation, Ms. Musonge held a recently-obtained leadership position with Wells Fargo.

79.     Defendant, through its Chief Executive Officer Kelley Cornish, made clear and definite promises to Ms. Musonge, including promises of career growth, professional stability, and long-term opportunity within the Foundation, in order to induce Ms. Musonge to leave her position at Wells Fargo and accept the role of Chief Marketing and Administrative Officer.

80.     Ms. Musonge reasonably and justifiably relied on these promises in resigning from her leadership position at Wells Fargo and accepting employment with the Foundation, and she further made plans to relocate herself and her family from Pennsylvania to Texas in continued reliance on these representations.

81.     Defendant's promises were of a definite and substantial character such that injustice can only be avoided by their enforcement.

82.     Rather than honoring its commitments, Defendant demoted Ms. Musonge, stripped her of eighteen direct reports, retitled her position from Chief Marketing and Administrative Officer to Chief Administrative Officer, and ultimately terminated her employment – all in retaliation for Ms. Musonge's lawful reports of and refusal to engage in unethical and illegal conduct.

83.     Ms. Musonge suffered substantial and foreseeable harm as a direct and proximate result of her reasonable reliance on Defendant's promises, including the loss of her prior position at Wells Fargo, lost compensation and benefits, harm to her professional reputation and career, and significant emotional distress.

## COUNT III
### Breach of Implied Contract of Employment

84.     Plaintiff Manokia Musonge repeats and incorporates by reference the allegations of

all previous paragraphs as if fully set forth at length herein.

85.    As set forth above, Ms. Musonge has alleged facts from which it can be determined that there was an implied contract for employment between Ms. Musonge and Defendant based upon additional consideration under which Ms. Musonge would benefit from career growth, professional stability, and long-term opportunity within the Foundation.

86.    Defendant's termination of Ms. Musonge without just cause was a breach of the implied contract for employment between Ms. Musonge and Defendant.

87.    In accepting employment with Defendant, vacating her lucrative and stable position with Wells Fargo and foregoing other employment opportunities, Ms. Musonge suffered significant hardship.

88.    The parties understood that they were creating an implied contract based upon the promises made to Ms. Musonge by Defendant.

89.    As a direct and proximate result of the unlawful employment practices engaged in by Defendant, Plaintiff Manokia Musonge has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon.

90.    Defendant's conduct is without excuse or justification.

## COUNT IV
### Unjust Enrichment

91.    Plaintiff Manokia Musonge repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

92.    In the alternative, Defendant made promises to Ms. Musonge regarding the expectation of career growth, professional stability, and long-term opportunity within the Foundation.

11

93.     Plaintiff reasonably relied upon these promises to her detriment by resigning from her position with Wells Fargo, foregoing other opportunities and making plans to relocate her family from Pennsylvania to Texas.

94.     Defendant did not honor its promises and instead demoted Ms. Musonge, stripped her of eighteen direct reports, retitled her position from Chief Marketing and Administrative Officer to Chief Administrative Officer, and ultimately terminated her employment – all in retaliation for Ms. Musonge's lawful reports of and refusal to engage in unethical and illegal conduct

95.     Ms. Musonge suffered damages as a result of her reasonable reliance upon Defendant's promises.

96.     Defendant has been unjustly enriched as set forth above.

## COUNT V
### Fraudulent Inducement

97.     Plaintiff Manokia Musonge repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

98.     Defendant fraudulently induced Ms. Musonge to accept employment with Defendant based on the fraudulent promises that she would realize career growth, professional stability, and long-term opportunity within the Foundation.

99.     At the time Defendant made the above representations, it did not intend to abide by the representations it had made.

100.     The misrepresentations made by Defendant were fraudulent.

101.     The misrepresentations made by Defendant were of material facts.

102.     Plaintiff relied on the false and/or misleading statements, conduct and representations of Defendant and sustained the losses and damages as previously set forth herein.

103.	The misrepresentations by Defendant induced Plaintiff to leave a stable and lucrative position and forego other opportunities.

104.	Defendant intended that Plaintiff would rely upon the misrepresentations.

105.	Plaintiff suffered damages as a result of the foregoing fraudulent misrepresentations.

106.	As the direct result of the aforesaid unlawful conduct engaged in by Defendant, Plaintiff Manokia Musonge has sustained a loss of earnings, interest due thereon and has incurred an obligation for attorneys' fees and costs.

## PRAYER FOR RELIEF

107.	Plaintiff Manokia Musonge repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Manokia Musonge respectfully requests that this Court enter judgment in her favor and against Defendant and Order:

a.	Appropriate equitable relief including reinstatement or front pay;

b.	Defendant to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful retaliation;

c.	Defendant to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of its unlawful conduct;

d.	Defendant to pay Plaintiff punitive damages;

e.	Defendant to pay Plaintiff liquidated damages;

f.  Defendant to pay Plaintiff compensatory damages for pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g.  Defendant to pay Plaintiff's costs of bringing this action and her attorneys' fees;

h.  Plaintiff be granted any and all other remedies available pursuant to Pennsylvania common law; and

i.  Such other and further relief as is deemed just and proper.

## JURY DEMAND

Plaintiff Manokia Musonge hereby demands trial by jury as to all issues so triable.

BELL & BELL LLP

By:    */s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 John F. Kennedy Blvd. – Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff Manokia Musonge*

Dated:  June 11, 2026